UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
X------------------------------------------------------------------X

BENJAMIN MORDUKHAEV, ROBERT DYCE, MARC
BUTCHER, MUSTACH ALI, JORGE AVILA, IGOR
MODIN and MOHAMMAD BUTT, individually and on
behalf of all others similarly situated,

                                           Plaintiffs,

                -Against-

MATTHEW DAUS, RAYMOND SCANLON,
CARMENA SCHWECKE, THE NEW YORK CITY
TAXI AND LIMOUSINE COMMISSION, and THE
CITY OF NEW YORK,

                                  Defendants.

X------------------------------------------------------------------X

**SECOND AMENDED
COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
DAMAGES**

**JURY TRIAL DEMANDED**

**09-CV-5149 (SHS)(RLE)**

       Plaintiffs Benjamin Mordukhaev, Robert Dyce, Marc Butcher, Mustach Ali, Jorge

Avila, Igor Modin and Mohammad Butt, individually and on behalf of all others similarly

situated, by their attorney, Daniel L. Ackman, as and for their complaint, allege as follows:

**NATURE OF THE ACTION**

       1.      This action based on the New York City Taxi and Limousine Commission's

unlawful and arbitrary denial of taxi driver licenses to applicants whose licenses have been

previously revoked.  While the law and rules governing the taxi commission permit drivers to

apply for a new license following a prior revocation without prejudice, TLC Chairman

Matthew Daus enforces an unwritten and arbitrary policy by which he denies such

applications without lawful cause in nearly every case.

2.      The qualifications for a NYC taxi driver's license (a/k/a a hack license) are set forth in the New York City Administrative Code and in the TLC Rules. The statutory qualification provisions apply to both yellow cab drivers and for-hire-vehicle drivers.  Where an applicant meets those qualifications, the Code permits the TLC no discretion, but requires that the license be issued.  Thus when an individual complies with statutory standards, he has a legitimate claim of entitlement to a taxi driver's license.

3.      From time to time, the New York City Taxi and Limousine Commission (TLC) revokes a hack license.   Some revocations are based on TLC rules or local laws. Other revocations are based on unwritten (and therefore illicit) policies adopted without notice by the TLC chairman.  Whatever the basis for the revocation, the laws and rules governing the TLC permit a former taxi driver to apply (or reapply) for a new license.  (In some cases, the rules require the former driver wait one year before applying again.)

4.      While nothing in the laws or rules governing the TLC indicates that a second application should be prejudiced by the prior revocation, the TLC, as a matter of policy and practice, requires formerly licensed drivers to submit to a "fitness hearing," which is presided over by a TLC administrative law judge (ALJ).  The ALJ, after the hearing, recommends to TLC Chairman Matthew Daus whether the application should be granted or denied.  Matthew Daus then rules on the application.

5.      Both the TLC judges and especially Chairman Daus routinely ignore the statutory qualifications for licensure.  Instead, the chairman applies his own unwritten rules, governing by personal whim.  As a matter of practice, Chairman Daus denies almost every reapplication without reference to the Administrative Code or TLC Rules. The TLC hearing procedures, the structure of its courts, and especially Chairman Daus's review violate New

York City law, state law, TLC Rules, and the Constitutions of New York State and the United States.

6.      The chairman's actions intentionally frustrate the legitimate claims of entitlement that applicants have to a taxi driver's license.  Plaintiffs bring their claims pursuant to the United States Constitution, as amended, the Civil Rights Act of 1871, 42 U.S.C. § 1983, the New York State Constitution, and New York law.  They seek redress for defendants' deprivation, under color of state law, of their rights, privileges, and immunities secured by the Constitution and laws of the United States and by the New York State Constitution.  As the TLC's practice has no basis in state or city law, and indeed violates state and city law, plaintiffs seek redress under state law as well.

## JURISDICTION AND VENUE

7.      This action arises under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983, and under the New York State Constitution, Article 1, § 12.

8.      The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, 1343(4), 1367, and 2201.

9.      The acts complained of occurred in part in the Southern District of New York and venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b).  The Taxi and Limousine Commission maintains its headquarters in the Southern District of New York.

## JURY DEMAND

10.     Plaintiffs demand trial by jury in this action.

**PARTIES**

11.     Plaintiff Benjamin Mordukhaev obtained his first New York City taxi driver's license in 1985.  At one time he owned his taxi medallion, but sold it in 1993.  He is a resident of Kings County.  His taxi driver's license was revoked in January 2007.  He applied for a new license in January 2008 and again in late 2008.  On both occasions he was summoned to a fitness hearing.

12.     Following the first hearing, the TLC judge recommended Mr. Mordukhaev's license be granted.  Chairman Daus rejected the recommendation and denied the application. After the second hearing, the TLC judge recommended that the license be denied.  Chairman Daus accepted the recommendation and denied the application.

13.     Mr. Mordukhaev is a resident of Kings County.

14.     Plaintiff Robert Dyce obtained his first New York City taxi driver's license in 1998.  Chairman Daus revoked his license in 2007 in response to a misdemeanor conviction involving an improper designation on a parking badge that Mr. Dyce used in his capacity as an ordained minister.  He applied for a new license in 2007.  The TLC ALJ recommended a license be granted, but Chairman Daus denied the license.

15.     Mr. Dyce is a resident of Bronx County.

16.     Plaintiff Marc A. Butcher obtained his first New York City taxi driver's license in 1973 and had been licensed continuously since 1982 until 2006 when his license was revoked in response to a positive drug test.  He applied for new license in 2008.  The TLC ALJ recommended a license be granted, but Chairman Daus denied the license.

17.     Mr. Butcher is a resident of Kings County.

18.     Plaintiff Mustach Ali obtained his first New York City taxi driver's license in 1998.  Chairman Daus revoked his license in 2006 in response to a conviction for driving while ability impaired, which occurred in Orange County, NY, while Mr. Ali was driving his personal car.  Mr. Ali applied for a new license in 2008.  The TLC ALJ recommended his application be denied and Chairman Daus accepted that recommendation and denied the license.

19.     Mr. Ali is a resident of Bronx County.

20.     Plaintiff Jorge Avila obtained his first New York City taxi driver's license in 1999. Chairman Daus revoked his license in 2006 in response to a conviction for driving while ability impaired, which occurred in when Mr. Avila was resting in his personal car. Mr. Avila applied for a new license in 2007. The TLC ALJ recommended a license be granted, but Chairman Daus denied the license.

21.     Mr. Avila is a resident of Queens County.

22.     Plaintiff Igor Modin obtained his first New York City taxi driver's license in 1996.  The TLC revoked it 2001 based on its finding that there was a "masking agent" in his urine during his annual drug test.  Mr. Modin applied for a new license twice in 2008. Following the first application, the TLC ALJ recommended denying the license and Chairman Daus did deny the license.  Following the second application, the TLC ALJ recommended granting the license.  Still, Chairman Daus denied the license.

23.     Mr. Modin is a resident of Kings County.

24.     Plaintiff Mohammad Butt obtained his first New York City taxi driver's license in 1975.  The TLC revoked his license in 2006 because he accumulated 11 points on his DMV license.  Mr. Butt applied for a new license twice, the first time in 2008 and again

in 2009.  Following his 2008 application, the TLC ALJ recommended granting the license.

But Chairman Daus rejected the recommendation and denied the license.  Following his 2009

application, the TLC ALJ recommended that the license be denied.  Chairman Daus accepted

the recommendation and denied the license.

25.     Mr. Butt is a resident of Kings County.

26.     Defendant Matthew Daus is chairperson of the Taxi and Limousine

Commission.  He has overall responsibility for enforcing TLC policy.  He is responsible for

implementing and overseeing the policies of the commission and for ensuring that TLC

personnel obey the Constitution and laws of the United States and of the State of New York.

27.     Defendant Raymond Scanlon is a deputy commissioner of the TLC in charge

of its Adjudications Department.

28.     Defendant Carmena Schwecke is the Chief Administrative Law Judge of the

TLC.

29.     Defendant NYC Taxi and Limousine Commission is an agency of the City of

New York charged with licensing taxi drivers, for-hire vehicle drivers and limousine drivers

and regulating the taxi industry.  Its headquarters is in New York County; the office housing

most of its employees is in Queens County.

30.     The TLC is a non-mayoral agency, meaning it is insulated by the City Charter

from direct mayoral control.  The TLC is a nine-member commission, with one member

acting as chairperson, who also has executive responsibilities.   It is empowered by the

Charter to act by a majority vote of its members.  In addition to the City Charter, the TLC is

governed by the Administrative Code of the City of New York, enacted by the City Council,

and by the TLC rules, enacted by majority vote of the full TLC.  In addition, the TLC maintains its own court system, for which it hires the judges, who work on a per diem basis.

31.     Defendant City of New York is a municipality of the state of New York, which includes the TLC as an administrative agency.

## CLASS ACTION ALLEGATIONS

32.     The plaintiff class seeks: (i) a declaration that the TLC's fitness hearing practice is unconstitutional and illegal; (ii) an order enjoining Chairman Daus and the TLC from denying licenses to taxi driver license applicants who meet the statutory qualifications; (iii) an order requiring the TLC to grant licenses to applicants who meet the statutory qualifications for licensure who whose applications were denied by Chairman Daus on "fitness" grounds; (iv) a declaration that the TLC must grant licenses to applicants who meet the statutory qualifications; (v) a declaration that the TLC tribunal is unconstitutionally structured; and (vi) compensatory and punitive damages and attorneys' fees.

33.     Plaintiffs sue on behalf of themselves and all other similarly situated individuals, and seek to represent, pursuant to Rule 23 (a), Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, two classes comprised of all taxi drivers who have had their licenses applications denied without lawful cause and absent a proper and meaningful hearings on the merits.

34.     The class period commences on the date three years prior to the date of the initial complaint in this case and extends to the date on which the defendants are enjoined from, or otherwise cease, enforcing their unconstitutional policies and practices.

35.     The members of the class are so numerous as to render joinder impracticable. Upon information and belief, based on TLC public records, there are more than 100 drivers

whose license applications have been denied on "fitness" grounds.  In addition, there are more than 41,000 yellow taxi drivers and roughly 60,000 for-hire-vehicle drivers licensed by the TLC, all of whom are subject to the TLC's license revocation policies and its reapplication policies.

36.    The vast majority of New York City taxi drivers are foreign born, most from countries with no tradition of civil rights.

37.    NYC taxi drivers are independent contractors and as such they have no labor union or collective bargaining unit.

38.    Upon information and belief, joinder is impracticable given the number of absent class members and because many members of the class are low-income persons, many of whom do not speak English well, and likely would have great difficulty in pursuing their rights individually.

39.    The questions of law and fact common to the class include whether the class members have common rights under the Fifth and Fourteenth Amendments to be free from unlawful license denials and unconstitutional practices and policies.

40.    The named plaintiffs are adequate representatives of the class.  The violations of law alleged by the named plaintiffs stem from the same course of conduct by defendants, which violated and continues to violate the rights of members of the class; the legal theory under which the named plaintiffs seek relief is the same or similar to that on which the class will rely.  In addition, the harm suffered by the named plaintiffs is typical of the harm suffered by absent class members.

41.    The named plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.  Counsel for the plaintiffs knows of no conflicts among members of the class.

42.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because: (a) the prosecution of hundreds or thousands of separate actions would be inefficient and wasteful of legal resources; (b) the members of the be able to vindicate and enforce their Constitutional and statutory rights unless this action is maintained as a class action; (c) the issues raised can be more fairly and efficiently resolved in the context of a single class action than piecemeal in many separate actions; (d) the resolution of litigation in a single forum will avoid the danger and resultant confusion of possibly inconsistent determinations; (e) the prosecution of separate actions would create the risk of inconsistent or varying adjudications with respect to individuals pursuing claims against defendants, which would establish incompatible standards of conduct for defendants; (f) defendants have acted and will act on grounds applicable to all class members, making final declaratory and injunctive relief on behalf of all members necessary and appropriate; and (g) questions of law and/or fact common to members of the class, especially on issues of liability predominate over any question, such as that of individual damages, that affect individual members.

**TAXI DRIVER LICENSE QUALIFICATIONS**

43.    The qualifications for a NYC taxi driver's license are set forth in Section 19-505(b) of the NYC Administrative Code as enacted by the City Council.  That section provides:

> Each applicant for a license, other than a commuter van driver's license, must:

1. Hold a New York state chauffeur's license.

2. Be nineteen years of age or over.

3. Be of sound physical condition with good eyesight and no epilepsy, vertigo, heart trouble or any other infirmity of body or mind which might render him or her unfit for the safe operation of a licensed vehicle.

4. Be fingerprinted.

5. Be of good moral character.

6. Not be addicted to the use of drugs or intoxicating liquors.

44.        Section 19-505 further provides, per subsection (d), that applicants shall be examined as to their physical condition by a duly licensed physician designated by the commission and that applicants shall also be examined by the commission as to his or her knowledge of the city.

45.        Finally, subsection (f) states: "Upon satisfactory fulfillment of the applicable requirements, there shall be issued to the applicant a driver's license which shall be in such form as the commission may direct." In short, the statute does not vest the chairman or the TLC with any discretion to deny a license to a qualified applicant. Once an applicant has met the requirements and passed the licensing exams, an applicant has a legitimate claim of entitlement to a license. Once an applicant meets statutory requirements, issuance of the license is mandatory.

46.        The TLC's own Rule 2-02 tracks and restates in substance the qualifications stated by the Administrative Code.

47.        The Administrative Code and the TLC Rules contain a detailed scheme for the regulation of the taxi industry and taxi drivers in particular. The Code and the TLC Rules include hundreds of rules, regulations and concomitant penalty provisions that may

result in monetary fines of up to $10,000 as well for the suspension or revocation of hack licenses.

48.     There are no separate statutes or written rules governing post-revocation applications or re-applications (apart from the one-year waiting period, which applies in some cases).  More specifically, there are no statutes or written rules requiring proof of rehabilitation or remorse.

49.     The chairman likewise has no authority to deny an application based on his opinion concerning the quality of the applicant's record.

50.     Acting by TLC Rule 8-15 (part of the TLC's "Adjudications Rules") the TLC claims the right to require a "fitness hearing" where "the Commission believes that a licensee or applicant for a license … does not meet or does not continue to meet the qualifications for licensure, as set forth in Commission Rules."

51.     Fitness hearings are held at the TLC headquarters in New York County.

52.     Such hearings are governed by the City Administrative Procedure Act (CAPA), as well as constitutional due process norms.

53.     In notices of fitness hearings, the TLC failed to provide plaintiffs with reasonable notice, statements of the legal authority and jurisdiction under which the hearing was to be held, reference to particular sections of law or rules said to be involved, and a short and plain statement of the matters to be adjudicated.

54.     CAPA provides that the TLC, as the party initiating the hearing, shall have the burden of proof in fitness hearings.

55.     In fact, at reapplication hearings, the chairman admits that he imposes the burden of proof on applicants.

56.      There is no Commission Rule that states any qualifications for licensure

other than TLC Rule 2-02, which is part of the Driver Rules, and which tracks the

Administrative Code.   In particular, nothing in the TLC Adjudications Rules states the

standard or rules that might be applied at fitness hearings.

57.      As a matter of policy and practice, the TLC rarely (if ever) alleges or

attempts to prove a lack of good moral character.

58.      Despite the absence of discretion in the statutory scheme, Chairman Daus,

and the TLC ALJs acting at the Chairman's direction, routinely state additional unwritten,

unpublished licensing standards or rules.  Such standards were never voted upon or enacted

by the TLC Commissioners and were never passed by the City Council.

## POST-REVOCATION APPLICATIONS

59.      Drivers who have had their licenses revoked may apply later for a new

license.  In some cases TLC Rules state they must wait one year to reapply; in others there is

no waiting period.   Where a driver has suffered revocation, the TLC routinely orders a

fitness hearing.  A TLC ALJ presides over the fitness hearing and makes a recommendation

to Chairman Daus.  The chairman rules on the application.  That ruling is final.

60.      Chairman Daus denies post-revocation applications in the vast majority of

cases.  In one recent 18-month period, 138 post-revocation applications resulted in fitness

hearings.  Of these 138 applications, 58 received positive recommendations from the ALJ.

Of the 58 who received positive recommendations, Chairman Daus rejected the ALJ's

recommendation and denied the license 48 times.   In the vast majority of those cases, the

chairman did not allege any statutory disqualification, but gave reasons of his own invention

that appear nowhere in the Administrative Code or in TLC rules. In cases where the ALJ recommended denying the license, Chairman Daus agreed with the ALJ every time.

## THE TLC TRIBUNAL

61.    The TLC maintains an administrative tribunal that employs ALJs responsible for adjudicating alleged violations of TLC rules. The tribunal also "fitness hearings," the hearings primarily at issue in this case.

62.    While most rule infraction cases are initiated by the TLC itself, a minority of cases are generated through complaints by passengers. In these cases, known as customer complaints, the TLC issues a summons based on the customer's statement.

63.    At customer complaint hearings, customers are allowed to testify by affidavit or by telephone. Taxi drivers, however, must appear in person.

64.    In recent months, following the passage of new legislation by the City Council, the TLC has been encouraging passengers to appear by telephone, even though the legislation requires the TLC to attempt to secure the passenger's in-person testimony at the hearing.

"Fitness" Hearings:

65.    In addition, some (though not all) of these ALJs conduct so-called fitness hearings at which there is no allegation of a TLC rule violation, but where the issue is whether the taxi driver is "qualified" to hold a license.

66.    There are several types of fitness hearings. These hearings involve (a) determinations on applications by individuals who have never had a TLC license; (b) determinations in cases where the TLC is seeking to suspend a license; (c) determinations in cases where the TLC is seeking to revoke a license; and (d) determinations on applications

by individuals who have previously held a TLC license, including where that prior license was revoked.

67.     In fitness cases, the ALJ issues a recommendation to Chairman Daus as to whether the license should be suspended, revoked, or issued.  The chairman is then free to accept, modify or reject the recommendation.  (In cases involving application by individuals who have never held a TLC license, not at issue here, the recommendation goes to the deputy commissioner for licensing.)

68.     Chairman Daus's rulings in fitness cases are final.

69.     Neither the ALJ decisions nor Chairman Daus's are published or available to the public.

70.     Since sometime in 2007, the TLC has referred certain fitness hearings involving the potential revocation of licenses to the Office of Administrative Trials and Hearings (OATH), a separate city agency.  While OATH judges are not employed by the TLC, they too make recommendations to the Chairman (not dispositive rulings).   The chairman is free to accept, modify or reject the OATH recommendations.

TLC Judges:

71.     TLC judges are not independent of the agency.

72.     TLC judges are hired by the TLC on a per diem basis.  They may be fired by the TLC without cause.  They have no contractual, civil service or statutory job protections.

73.     TLC judges are required to request hours of assignment on a monthly basis, but they have no right to any particular hours or days of assignment.  TLC executives supervise the judges and determine their assignments.  In short, the TLC judges are

dependent on the TLC executives for the payment of their salaries and the tenure of their offices.

74.    There is a wide variation in pay between one TLC judge and another.

75.    Favored TLC judges may be promoted to more preferred positions (such as adjudicating fitness hearings).  Less favored judges may continue to adjudicate ordinary citations.

76.    Favored TLC judges may also be hired, and have been hired, to full-time positions within the TLC executive arm.  Such promotions bring added status, job security, and generally an increase in pay.

77.    TLC judges have routinely been instructed about TLC policies (including unwritten policies) on an *ex parte* basis.

78.    The *ex parte* instructions come in the form of informal tutelage of judges, informal instructions and through the dissemination of manuals written for ALJs, but which are not available to taxi drivers, their lawyers or the public.

79.    In certain cases, such as where the TLC initiated its "Operation Refusal" initiative in late 1999, the TLC has drafted memos to its judges instructing them how to rule in particular cases.  In the case of the Operation Refusal instructions, the memo violated both TLC rules and prior TLC policy.

80.    In the rare events where TLC judges have ruled in ways that are contrary to ex parte instructions, they have, from time to time, been terminated, reprimanded, instructed to refrain from such rulings, and threatened with demotion.

81.    On at least one occasion, Mr. Daus, when he was acting as special counsel to the agency, summoned an ALJ, Eugene Glicksman, to his office for purposes of firing him.

But when the ALJ arrived, Mr. Daus fled the office and had a colleague deliver the news to the ALJ of his termination.

82.     In another case, Mr. Daus fired summarily fired the TLC's director of adjudications, Dominic Pistone, who had tried to insure the integrity of the tribunal and had clashed with Mr. Daus.

83.     The TLC has argued successfully in federal court that its judges, as at-will employees, have no right to decisional independence and may be fired for any reason or no reason, even for issuing proper decisions that are contrary to the unwritten policy of the TLC executive arm.  *See Glicksman v. New York City Environmental Control Board, et al*, 01 Civ. 4048 (LAP).

**TLC RULEMAKING**

84.     Like all New York City agencies, the TLC is governed by the City Charter and the New York City Administrative Code (Administrative Code).  The City Charter created the TLC as a nine-member commission and requires that the commission acts by majority vote of its members.  The TLC Chairperson is one member of the commission.  The chairperson has an equal vote with the other commissioners.  He also has executive responsibilities for insuring that the Administrative Code, enacted by the City Council, and TLC rules enacted by the nine-member commission be properly executed.

85.     The TLC commissioners have never voted on either the Chairman Daus's policy of revoking licenses for any drug test failure or his policy of revoking a license for a criminal conviction.  Nor have they voted on the Chairman's policy of denying nearly all post-revocation license applications.

86.    The TLC never gave public notice or allowed for comment on Chairman Daus's policy of revoking licenses for any drug test failure or his policy of revoking a license for a criminal conviction. The TLC never gave public notice or allowed for comment on these policies.

## THE INDIVIDUAL PLAINTIFFS

<u>Benjamin Mordukhaev:</u>

87.    In December 2006, Mr. Mordukhaev was charged, based on a customer complaint, with overcharging a passenger by approximately $24, the alleged overcharge having occurred on September 3, 2006.

88.    The TLC summoned Mr. Mordukhaev to a hearing January 5, 2007 at which Mr. Mordukhaev appeared without counsel. The summons listed five alleged rule violations, including the same rule twice, all for the same alleged conduct. (This charging practice is itself a violation of TLC policy, which bars the assertion of two rule violations based on the same conduct.)

89.    While the summons listed the rules allegedly violated, it did not provide Mr. Mordukhaev with a short and plain statement of the matters to be adjudicated or any statement detailing the facts and circumstances of the alleged violations. The summons listed the place of the violation as "47th & Bway". But all the evidence was that the violation occurred, if at all, at the end of the trip in question, that is at Kennedy Airport.

90.    The complaining witness did not appear, testifying instead by affidavit. The substance of the affidavit was that the taxi driver had overcharged C by not running the meter by demanding a fixed $45 fare plus tolls. The witness (called "C" by the TLC judge) was

never named or identified either in the summons or the TLC judge's decision and was not available for cross-examination.

91.    C's affidavit was the only evidence against Mr. Mordukhaev.

92.    Previously, as noted in the TLC judge's decision, the same charges had been brought against Roman Mordukhaev, Benjamin's brother, who was also a taxi driver. The charges were dismissed against Roman and re-filed against Benjamin.

93.    C's affidavit stated that Mr. Mordukhaev was of "middle eastern or eastern European descent" and was about 5-feet-9 inches tall. (The affidavit stated that the driver had exited the cab to help with luggage.) In fact, Mr. Mordukhaev hails from Azerbaijan in central Asia and is 5-feet-4 inches tall.

94.    The affidavit also stated that C did write down the taxi driver's name or license number (only the medallion number). It further states that C waited until passing through security at Kennedy Airport (C's destination) before calling 311 to initiate a complaint. Of course, since the complaining witness did not attend the hearing, he or she could not identify Mr. Mordukhaev or admit that a mistake had been made and that Mr. Mordukhaev was not the driver in question. Despite the fact that the affidavit did not identify Mr. Mordukhaev and that the affidavit testimony did match Mr. Mordukhaev's height, age or nationality, the TLC judge pronounced C's testimony "credibl[e]."

95.    Mr. Mordukhaev appeared at the hearing without counsel. He denied the charges and presented his trip sheet (a required record of fares and destinations) for the day in question, as well as his brother Roman's trip sheet for the same day. The TLC judge noted that neither trip sheet showed a trip to Kennedy Airport at the time in question. The TLC judge wrote that Mr. Mordukhaev's trip sheet was " 'an original' [but] it is not necessarily

'the' original."  Thus the judge found the document to be not credible and went on to say "I do not find any part of [Mr. Mordukhaev's] testimony to be credible."  The judge then found Mr. Mordukhaev to be guilty of a $24.75 overcharge, a violation of TLC Rule 2-34A, and revoked his license.

96.    Mr. Mordukhaev hired counsel to file an appeal, which noted the absence of live testimony, an error in the calculation of the overcharge, C's failure to record the driver's name or license number, and the lack of evidence that Mr. Mordukhaev was even at the airport.  That appeal was denied by the TLC's Chief Administrative Law Judge in a largely boilerplate letter that stated, "Credibility findings are not disturbed if they are supported by substantial evidence."

97.    After his appeal of the ruling was denied, Mr. Mordukhaev applied for a new license in January 2008.  To complete that application, Mr. Mordukhaev completed a training course, was fingerprinted as part of a background check, took and passed a drug test, completed the necessary course and passed the requisite exams.

98.    To complete the application, Mr. Mordukhaev, like all applicants, was required to pay approximated $400 in fees and tuition.

99.    Though there was no allegation or suggestion that Mr. Mordukhaev did not meet the statutory standards for licensure, he was ordered to submit to a fitness hearing, which was held on May 8, 2008.

100.    At that hearing, Mr. Mordukhaev testified he still had no recall of the overcharge incident and that he believed an error had been made.  He further testified that he had three children, aged 10, 17 and 18, who he supported.  The ALJ stated: "While the issues surrounding his prior license application may not be revisited here, there remains the

-19-

question whether the [Mr. Mordukhaev] was the actual driver involved." The ALJ further

that Mr. Mordukhaev was "forthright and sincere" as well as "understated and modest."

Based on this testimony and Mr. Mordukhaev's "clean criminal and TLC records" since the

revocation, he recommended the license be granted.

101.    Ten weeks later, Chairman Daus denied the application.   He faulted the ALJ

for his "readjudicat[ion]" of the "previous conviction."  He stated that Mr. Mordukhaev's

record was "poor," though Mr. Mordukhaev's license had never been even suspended based

on his record prior to the revocation.  Finally he announced, "Little evidence of rehabilitation

was presented at your hearing and I find you cannot be trusted."

102.    The chairman cited no Code provision and no TLC Rule.

103.    Mr. Mordukhaev applied again for a license in 2009.  He was again referred to

a fitness hearing, which was held on March 5, 2009.  This time the ALJ, agreeing with

Chairman Daus, recommended denial on the ground that Mr. Mordukhaev "continued to

deny" the overcharge and that he "took no responsibility" for it.   Thus the ALJ found "no

evidence that he is rehabilitated," adding that Mr. Mordukhaev had a poor driving record.

104.    By letter dated May 4, 2009, Chairman Daus accepted this ALJ's

recommendation and denied the license.

105.    The chairman cited no Code provision and no TLC Rule.

Robert Dyce:

106.    On or around April 11, 2006, Mr. Dyce pled guilty to criminal possession of a

forged instrument, a Class A misdemeanor.   He was sentenced to a two days community

service and a $160 fine.   The crime occurred when Mr. Dyce, an ordained minister, was

found to have a police department insignia on a parking badge that permitted him to park in

front of his church, otherwise a restricted zone.  While Mr. Dyce was entitled to have the parking badge, he was not entitled to a police department insignia.

107.    Mr. Dyce was not informed by the TLC (nor by his lawyer nor the criminal court) that the conviction would impact his taxi driver's license.

108.    There is nothing in the Code or the TLC Rules that states or implies that a taxi driver's license may be revoked on the basis of a misdemeanor conviction.

109.    Based on this misdemeanor conviction, however, Chairman Daus ordered Mr. Dyce's taxi driver's license be revoked.

110.    Mr. Dyce applied for a new license in or around May 2007. He completed the required courses and passed the requisite exams.  He was referred for a hearing, which was held on October 18, 2007.  He testified as to the circumstances of his crime and indicated that the inclusion of the police insignia on his minister's parking badge was a mistake.

111.    The ALJ noted that his crime "indicates dishonesty" but that Mr. Dyce had testified "in a sincere and forthright manner."   The ALJ noted that his DMV record was "excellent" and that the last time he had been credited with points on his TLC license was 6½ years earlier.  Thus the ALJ found that Mr. Dyce was "rehabilitated" and recommend his license be granted.

112.    Chairman Daus concluded that Mr. Dyce was not rehabilitated, rejected the ALJ's recommendation and denied the license.

113.    The chairman cited no Code provision and no TLC Rule.

Marc Butcher:

114.    In August 2006, Mr. Butcher received a notice by mail from the TLC indicating his taxi driver's license had been revoked as a result of a positive drug test, which

was reported to the TLC in January 2006.  That notice was, on information and belief, mailed to Mr. Butcher's prior address on Woodruff Avenue in Brooklyn and was eventually forwarded to him at his current address on St. James Place in Brooklyn.

115.    Mr. Butcher had received no notice of his failed drug test or of any license suspension based on the drug test result.  (He received no notice even though TLC agents are supposed to telephone drivers whose drug tests results are positive and even though drivers are supposed to be afforded a hearing if a drug test is positive.)  There was no hearing prior to his revocation and Mr. Butcher had no opportunity to dispute the alleged drug test result or contest his revocation.

116.    Mr. Butcher applied for new license in 2008.  He completed the required courses and passed the requisite exams.

117.    On February 17, 2009, Mr. Butcher was summoned to a fitness hearing to be held on March 5, 2009.  The summons did not state the reason for the hearing but did note: "FAILD DT; PRIOR TLC REVOCN LIC # 390460; 3/24/06. MARAJUANA."  Apparently this notation is a reference to Mr. Butcher's allegedly failed drug test, the failure indicating marijuana residue in his urine, and his license revocation, which apparently occurred in March 2006, five months before Mr. Butcher received notice of the event.  The summons also stated that Mr. Butcher would have the burden of proof at the hearing.

118.    Mr. Butcher appeared at the hearing pro se.  He was accompanied by his rabbi, William Adams, and his lifelong friend and former driver Harold Stewart.  Both testified as character witnesses.  Mr. Stewart testified that Mr. Butcher is highly trustworthy.  Rabbi Adams testified that he had known Mr. Butcher since 1983, that they study together, and that Mr. Butcher is "a spiritual man and a scholar" and that his character is "impeccable."

119.    Testifying on his own behalf, Mr. Butcher denied he had taken marijuana, that he is a religious man, that he never uses drugs and said he had no explanation for the apparent drug test result.  Mr. Butcher also testified that he had been previously accused of refusing service and was suspended for nearly two months on that account before he was exonerated on the charge.  As a result of that suspension, Mr. Butcher was part of a class action lawsuit, that he had recently recovered damages as a result of that lawsuit, and that the allegedly positive drug test might have been in retaliation.  He also testified that he is married and that he is a self-published author licensed to sell books to the NY Board of Education.

120.    The ALJ recommended that he license be granted.  He said Mr. Butcher's testimony was credible, that if he had taken marijuana, there was evidence of rehabilitation, that Mr. Butcher was in compliance with TLC Rule 2-02A4, that he had a good driving record and that he has good moral character.

121.    Chairman Daus rejected the ALJ's recommendation and denied the license.  In his letter, Mr. Daus stated that reapplication hearing was on February 3, 2006, when in fact it was held on March 5, 2009.  The chairman noted his denial and his suggestion of retaliation. Having heard no testimony and never having met Mr. Butcher, the chairman found he was in fact dishonest.  The chairman concluded: "By continuing to deny using marijuana, you have failed to accept responsibility for your actions and show that you cannot be relied upon not to deny them in the future…. [Y]our lack of candor regarding your previous drug use demonstrates that you cannot be relied upon to be honest and forthcoming with the TLC, qualities that are fundamental to licensure."

122.    The chairman cited no Code provision and no TLC Rule.

Mustach Ali:

123.    On August 8, 2006, Mr. Ali pled guilty to driving while ability (DWAI) impaired, a traffic violation, in Orange County, New York.  At the time of his arrest, which was on Mr. Ali was off-duty and in a private car, not a taxi.  He was fined $380 and his Department of Motor Vehicles (i.e., driver's) license was suspended for 90 days.

124.    On or around August 9, 2006, the TLC, having learned of Mr. Ali's arrest on charges that included driving while intoxicated, a misdemeanor, suspended Mr. Ali's taxi driver license.  The suspension letter informed Mr. Ali that if the referenced charges were "Dismissed or Adjourned in Contemplation of Dismissal, the suspension on your TLC license will be removed."  Apparently the TLC was unaware that at the time of the suspension, the driving while intoxicated (DWI) charge had been dismissed already.

125.    The TLC summoned Mr. Ali to a fitness hearing that was held on August 22, 2006.  The ALJ conducting the hearing noted in her decision dated August 25 that Mr. Ali had been charged with a DWI violation as well as other charges, but failed to note that all the charges, except the DWAI charge had been dismissed.  The decision noted as well that Mr. Ali's unrefuted testimony was that he was driving home having shared a beer with friends, when he was pulled over at a checkpoint and arrested and that he had enrolled in a Drinking Driver Program (DDP) course.   The ALJ recommended revocation of Mr. Ali's license.

126.    By letter dated September 28, 2006, Chairman Daus accepted the recommendation, as he does in every such case.

127.    Mr. Ali applied for a new license in late 2007. He completed the required courses and passed the requisite exams.  On or around January 7, 2008, he was told he would

-24-

be referred for a fitness hearing.  He was further told, incorrectly, that after a review by an ALJ, the Deputy Commissioner of License would judge his application.

128.    On May 6, 2008, Mr. Ali was summoned to a hearing.  The summons referred to "[TLC] Rule 19-505B5 (General Provisions for the Licensing of Drivers.) , with respect to the respondent's DWAI." [sic]

129.    The ALJ recommended that the application be denied on May 22, 2008.  The ALJ cited Mr. Ali's DWAI conviction and concluded that "despite his excellent record…. there is insufficient evidence at this time that he will not drink and drive in the future."

130.    Chairman Daus accepted the recommendation and denied the license.

131.    The chairman cited no Code provision and no TLC Rule.

Jorge Avila:

132.    Mr. Avila's pled guilty to driving while ability impaired, a traffic violation, on April 23, 2006, the same day as his arrest.  He was fined $300 and granted a conditional discharge.  In addition, his DMV license was suspended for 90 days.

133.    Mr. Avila has no criminal record.

134.    In response, by letter dated July 17, 2006, Chairman Daus revoked his TLC license.

135.    Mr. Avila applied for a new license in 2007. He completed the required courses and passed the requisite exams.

136.    On July 23, 2007, Mr. Avila was summoned to a fitness hearing that was held on July 30, 2007.  The summons stated as the "basis: for the hearing Mr. Avila's Criminal Record."  In fact he had then, and still has, no criminal record.  The summons stated that Mr. Avila would have burden of proof at the hearing.

137.    The TLC ALJ recommended that the license be granted.  Mr. Avila testified that he was not driving his car when he was arrested, but was sleeping in vehicle parked outside a party that he had attended.  The ALJ noted Mr. Avila's "deep remorse," his rehabilitation, and his need to for a TLC license to support his family including a son in college and a daughter about to go to college.  Mr. Avila's testimony, the ALJ found, was "very credible."

138.    By letter dated September 28, 2007, Chairman Daus rejected the ALJ's recommendation and denied the license.  He stated that after just one year, Mr. Avila had not "had an adequate opportunity to establish rehabilitation."

139.    The chairman cited no Code provision and no TLC Rule.

Igor Modin:

140.    In 2001, the TLC revoked Mr. Modin's taxi driver's license upon a finding that there was a "masking agent" in his urine during his annual drug test.  At a hearing, he denied that he sabotaged the sample.  But, as with every taxi driver facing a drug test hearing in the TLC tribunal, his defenses were rejected and the ALJ recommended revocation.  Chairman Daus accepted the recommendation, as he does in every such case.

141.    Mr. Modin applied for a new license in 2008.  He completed the required courses and passed the requisite exams and was later summoned to a hearing.

142.    The TLC ALJ recommended the license be denied, citing his failed 2000 drug test and a "TLC conviction" for operating without a license as well as a DMV conviction for the same offense.  In fact, there was just one "conviction," which was by the DMV, the result of an unpaid traffic ticket.  The ALJ also faulted Mr. Modin for failing to "express remorse" for his past conduct.

143.    By letter dated June 11, 2008, Chairman Daus denied the application.

144.    The chairman cited no Code provision and no TLC Rule.

145.    Mr. Modin then attended and completed a substance abuse program conduced by an organization called New Directions.  Meanwhile he applied again for a taxi driver's license.

146.    On August 8, 2008, Mr. Modin was summoned to a hearing.  The summons stated no basis for the hearing at all.

147.    Following the hearing, at which Mr. Modin was represented by counsel, the TLC ALJ recommended granting the license.  The ALJ cited Mr. Modin's "relatively clean driving record."  The ALJ noted that he maintained his innocence as to his 2001 drug test failure, but credited him for his voluntary attendance and completion of the substance abuse program.  Finally, the ALJ noted that Mr. Modin provided references from two current employers.  Based on his "rehabilitation," the ALJ found that Mr. Modin possessed a good moral character sufficient to be licensed.

148.    By letter dated June 3, 2009, Chairman Daus denied the license.  He cited Mr. Modin's driving record, compounding a single failure to pay a traffic ticket into the appearance of multiple violations.  The chairman cited no Code provision and no TLC Rule.

Mohammad Butt:

149.    Mr. Butt first began driving a NYC taxi in 1975.  For ten years he drove yellow cabs.  Then in 1985, he changed to driving a black car, the type of for-hire-vehicle that primarily services corporate accounts.  As a black car driver, Mr. Butt owned his own vehicle and radio, which together represent an investment of at least $70,000.

150.    In 2006, the TLC revoked Mr. Butt's NYC taxi driver's license because he accumulated 11 DMV points on his driver's license, which he did because of two speeding tickets and one ticket for running a red light—all in 2004.   The revocation was pursuant to the TLC's "critical driver" rules, which have no barrier to subsequent relicensing.

151.    Since 2005, Mr. Butt has not accumulated any DMV points on his driver's license, though even after the revocation of his taxi driver's license, he continued to drive his personal car.

152.    In 2008, Mr. Butt applied for a new TLC license.  Following a hearing, the TLC ALJ noted in a decision dated April 17, 2008, that Mr. Butt "expressed remorse and accepted full responsibility" for the actions that led to his revocation.  The TLC ALJ noted Mr. Butt's "rehabilitation," found him to be of "good moral character" and recommended hid application be granted.

153.    By letter dated May 14, 2008, Chairman Daus rejected the recommendation. The chairman cited minor violations that had no impact on Mr. Butt's license, announced there was "little evidence of rehabilitation" from Mr. Butt's 2004 traffic infractions, and that he "cannot be trusted" to follow TLC rules and regulations.

154.    The chairman cited no Code provision and no TLC Rule.

155.    Mr. Butt applied again for a new TLC license in 2009.  He was summoned to a fitness hearing with the notice of hearing referencing his prior "critical driver" revocation.

156.    Following a hearing, the TLC ALJ noted in a decision dated May 15, 2009, that Mr. Butt had failed to explain why he had accumulated 11 DMV points in 2004 and that "what was missing was an admission of responsibility … for his poor driving."  The ALJ

concluded that Mr. Butt "has not demonstrated rehabilitation [or] accepted responsibility." Thus the ALJ recommended the application be denied.

157.    By letter dated June 5, 2009, Chairman Daus accepted the recommendation and denied the license.

158.    The chairman cited no Code provision and no TLC Rule.

## FIRST CLAIM FOR RELIEF / THE TLC TRIBUNAL

159.    Plaintiffs repeat and reallege paragraphs 1 through 157 as if the same were fully set forth at length herein.

160.    Because of the nature of their employment and compensation, TLC judges in fitness hearings are systemically biased in favor of the agency.

161.    To the extent TLC license applicant prevails at such a hearing, Chairman Daus deems himself authorized to reject the ALJ's recommendation without regard to statutory standards.

162.    Accordingly, no so-called fitness hearing conducted within the TLC tribunal is consistent with due process of law.

163.    By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which former taxi drivers may have their reapplications without a meaningful hearing and without standards established by law, defendants have deprived and will continue to deprive each and every plaintiff and members of the plaintiff class of rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, and of rights guaranteed by the Fourth, Fifth and Fourteenth Amendments of the United States Constitution.

164.    All defendants have acted under pretense and color of state law, in their individual and official capacities, and within the scope of their employment.  Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth, Fifth and Fourteenth amendments to the United States Constitution. Defendants have conspired among themselves to do so (taking numerous overt steps in furtherance thereof), and failed to prevent one another from doing so.

165.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' constitutional rights.

### SECOND CLAIM FOR RELIEF / UNCONSTITUTIONAL REVOCATION (MORDUKHAEV ONLY)

166.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein.

167.    Given the unconstitutional structure of the TLC Tribunal, Mr. Mordukhaev's revocation was ordered without due process of law and the order of revocation should be rescinded.

168.    All defendants have acted under pretense and color of state law, in their individual and official capacities, and within the scope of their employment.  Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth, Fifth and Fourteenth amendments to the United States Constitution. Defendants

have conspired among themselves to do so (taking numerous overt steps in furtherance thereof), and failed to prevent one another from doing so.

## THIRD CLAIM FOR RELIEF / FAIR NOTICE – DUE PROCESS

169.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein.

170.    By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which former taxi drivers may have their license applications denied without published standards established by law, defendants have deprived and will continue to deprive each and every plaintiff and members of the plaintiff class of fair notice, due process of law and the rights, remedies, privileges and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, and of rights guaranteed by the Fourth, Fifth and Fourteenth Amendments of the United States Constitution.

171.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

## FOURTH CLAIM FOR RELIEF / FAIR HEARINGS – DUE PROCESS

172.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein.

173.    By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which taxi drivers may have their licenses applications denied without a meaningful hearing based on lawfully promulgated standards, defendants have deprived and will continue to deprive each and every plaintiff and members of the plaintiff class of rights, remedies, privileges and immunities guaranteed to every

citizen of the United States, in violation of 42 U.S.C. § 1983, and of rights guaranteed by the Fourth, Fifth and Fourteenth Amendments of the United States Constitution.

174.    All defendants have acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment.  Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983, and by the Fourth, Fifth and Fourteenth amendments to the United States Constitution. Defendants have conspired among themselves to do so (taking numerous overt steps in furtherance thereof), and failed to prevent one another from doing so.

175.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' constitutional rights.

## FIFTH CLAIM FOR RELIEF / CAPA

176.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein.

177.    By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which former taxi drivers may have their applications denied based on the chairman's unwritten policies or whim, these policies and whims having been implemented defendants have violated and continue to violate the City Administrative Procedure Act, part of the City Charter of the City of New York.

178.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein.

**SIXTH CLAIM FOR RELIEF / ADMINISTRATIVE CODE**

179.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein.

180.    By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which taxi drivers may have their license applications denied without regard to the licensing standards in the Administrative Code of the City of New York, defendants have violated and continue to violate the Administrative Code.

181.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

**SEVENTH CLAIM FOR RELIEF / TLC RULES**

182.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein.

183.    By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which taxi drivers may have their licenses revoked based on unwritten rules and standards, defendants have violated and continue to violate TLC Rules.

184.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

**EIGHTH CLAIM FOR RELIEF / CORRECTIONS LAW**

185.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein.

186.    By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which former taxi drivers may have their license

applications denied based solely on a criminal conviction, defendants have violated the New York Corrections Law.

187.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

### NINTH CLAIM FOR RELIEF / NEW YORK STATE CONSTITUTION

188.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein. By implementing, promulgating, and continuing to enforce and/or effectuate a policy, practice and custom pursuant to which taxi drivers may have their licenses revoked without due process of law, defendants have deprived and will continue to deprive each and every plaintiffs and members of the plaintiffs class of rights, remedies, privileges and immunities guaranteed to every citizen of the State of New York in violation of the New York State Constitution, Article 1, § 6. Defendants have conspired among themselves to do so (taking numerous overt steps in furtherance thereof), and failed to prevent one another from doing so.

189.    All defendants acted under pretense and color of state law and in their individual and official capacities and within the scope of their employment.  Said acts by said defendants were beyond the scope of their jurisdiction, without authority of law, and in abuse of their powers, and said defendants acted willfully, knowingly, and with the specific intent to deprive plaintiffs of their rights secured by the New York State Constitution, Article 1, § 6.

190.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' constitutional rights.

**TENTH CLAIM FOR RELIEF / DUE PROCESS - CAPA – EX PARTE CONTACTS**

191.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein.

192.    The TLC systemically engaged in *ex parte* contacts with TLC judges.  These contacts deprived hearing respondents taxi drivers of due process of law and were in violation of CAPA.  The results of all adjudications contaminated by such contacts are void and any penalties proscribed as a result of such adjudications are void and of no force or effect.

193.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

**ELEVENTH CLAIM FOR RELIEF / DUE PROCESS – CAPA – NOTICE**

194.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein.

195.    In summoning drivers to TLC hearings, the TLC systemically denies drivers of the notice of wrongdoing required by CAPA and due process of law. The results of all adjudications contaminated by such notice are void and any penalties proscribed as a result of such adjudications are void and of no force or effect.

196.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

**TWELFTH CLAIM FOR RELIEF / CAPA – IMPROPER HEARINGS**

197.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein.

198.    The TLC systemically and specifically with regard to its reapplication policy conducted hearings at which, *inter alia*, it failed to sustain the burden of proof and provided no opportunity for plaintiffs to call, subpoena or cross examine relevant witnesses.  The results of all such adjudications are void and of no force or effect.

199.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

## THIRTEENTH CLAIM FOR RELIEF / CPLR ARTICLE 78

200.    Plaintiffs repeat and reallege paragraphs 1 through 158 as if the same were fully set forth at length herein.

201.    In denying the license applications of plaintiff who meet the statutory standards for licensure, the TLC has (a) failed to perform a duty enjoined on it by law; (b) acted in excess of its jurisdiction; (c) acted in way that is unlawful; and (d) acted in a way that is arbitrary, capricious and an abuse of discretion.

202.    This conduct is in violation of Article 78 and specifically Section 7803 of the New York Civil Practice Law and Rules.

203.    Defendants' actions were deliberate, reckless and indifferent to plaintiffs' legal rights.

## IRREPARABLE HARM

204.    As to each of the foregoing claims, if defendants' policy, practice and custom of denying taxi driver license applications is not enjoined, the named plaintiffs and the members of the plaintiffs class will be subjected to immediate and irreparable injury for which no adequate remedy at law exists in that members of the plaintiffs class will suffer continued violations of their rights under the Fourth, Fifth and Fourteenth Amendments to

the United States Constitution, Article 1, §§ 6 and 12 of the New York State Constitution and under state law.

## RELIEF REQUESTED

WHEREFORE, plaintiffs ask this Court:

A.        To enter an order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b) for the plaintiffs class described herein and naming plaintiffs as the class representatives.

B.        To enter a judgment declaring that defendants' policy, practice and custom concerning post-revocation reapplications is unconstitutional.

C.        To enter a judgment that the TLC Tribunal as structured is unconstitutional.

D.        To enter a judgment declaring that defendants' policy, practice and custom concerning post-revocation reapplications is illegal under state law.

E.        To enter a judgment declaring that defendants' hearing procedures are unconstitutional and in violation of state law.

F.        To issue an order enjoining preliminarily and permanently defendants' policy, practice and custom of denying license reapplications where the applicant has met the statutory standards for licensure.

G.        To issue an order requiring defendants to grant the application of every former taxi driver whose license has been unconstitutionally or unlawfully denied.

H.        To award the named plaintiffs and members of the class compensatory damages in an amount to be determined at trial.

I.        To award the named plaintiffs and members of the class punitive damages in an amount to be determined at trial.

J.    To award the named plaintiffs and members of the class reasonable attorney's

fees and costs.

K.    To grant such other and further relief as this Court shall find just and proper.

Dated: New York, New York
        July __, 2009


__/s/_____
Daniel L. Ackman (DA-0103)
12 Desbrosses Street
New York, NY  10013
(917) 282-8178

Attorney for Plaintiffs